UNITED STATES FEDERAL DISTRICT COURT
DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DORINA MAHLER,** an individual, <br><br> Plaintiff, | | Case No. 8:16-CV-530 |
| v. | | |
| **ELECTION SYSTEMS & SOFTWARE, LLC,** a Delaware Limited Liability Company, <br><br> Defendant. | | **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Dorina Mahler ("Ms. Mahler") is a working mother raising four (4) young children. Her youngest child was born on June 19, 2014, and she returned to work approximately one month later. Upon her return, Ms. Mahler learned she was assigned a new supervisor, who "poo-pooed" Ms. Mahler's desire to continue advancing in her profession at Election Systems & Software, LLC ("ES&S"). On June 4, 2015, ES&S terminated Ms. Mahler after she appealed her supervisor's decision not to promote her for a position as a Project / Release Manager even though she unofficially performed a Project / Release Manager's duties for the preceding two and one-half (2 ½) years.

## VENUE & JURISDICTION

2. This matter arises under federal and state law. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 based on Ms. Mahler's claims based on federal statutes. The Court also has supplemental jurisdiction of the Nebraska state law claims, pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2), because the acts forming the basis for the Complaint were orchestrated from, planned in and conducted in this District.

## PARTIES

4. Ms. Mahler is a naturalized United States citizen and resident of Omaha, Nebraska. ES&S hired Ms. Mahler on July 18, 2011. ES&S terminated her employment on June 4, 2015.

5. Defendant ES&S is a Delaware limited liability company with its principal place of business at 11208 John Galt Boulevard, Omaha, NE 68137. ES&S manufactures, sells or leases voting system equipment, software and services used by municipalities and counties in the United States.

## BACKGROUND FACTS

6. While an ES&S employee, Ms. Mahler married and gave birth to a child. Her baby was born on June 19, 2014, and Ms. Mahler spent approximately one month on leave pursuant to the Family and Medical Leave Act, ("FMLA"). When Ms. Mahler resumed her duties, ES&S allowed her to work from home for approximately three (3) months, until October 2014.

7. After she returned to work at the ES&S office, ES&S made changes to its PollBook[1] Team, to which Ms. Mahler was assigned. ES&S's PollBook Team[2] was responsible for maintaining and developing electronic pollbooks and software supporting them. The ES&S PollBook team used Agile Development methodologies, requiring developers, Quality Assurance analysts, a Scrum Master, Business Analysts, and Product Managers on the team. While on the PollBooks team, Ms. Mahler acted as Scrum Master, Business Analyst, and Quality Assurance Analyst, for all the products developed and maintained by the PollBook Team. Due to those changes in/around November 2014, ES&S assigned Jessica Blackman ("Ms. Blackman") as Ms. Mahler's supervisor. Ms. Blackman changed Ms. Mahler's work responsibilities. Ms. Blackman assumed Ms. Mahler's ability to perform job-related tasks, her ability to travel for the job, her

---

[1] In general, an electronic "pollbook" allows election officials to view voter registration information for an election.
[2] The ES&S team was small. Its members were expected to fulfill as many roles as necessary to maintain existing software and make improvements.

2

performance on the job, and her desire to grow with ES&S were diminished because Ms. Mahler was married, had four little children, including a nursing baby.

8.     As soon as Ms. Mahler started reporting to Ms. Blackman, Ms. Mahler's responsibilities were altered.  Ms. Blackman refused to allow Ms. Mahler to assist the Sales Department with EZRoster[3] presentations or participate in high-visibility / high impact projects. Ms. Mahler was equipped with the knowledge, experience, and ability for these projects—she participated in sales presentations and supported several elections during her tenure at ES&S prior to becoming pregnant.  She also assisted Debbi Breeling, a relatively inexperienced ES&S Business Analyst on the PollBook team to prepare for Sales presentations for EZRoster from January through March, 2014, after her pregnancy leave.  Ms. Blackman originally asked Ms. Breeling to prepare the sales presentations, travel to customer sites, and deliver the EZRoster sales presentations.  Ms. Breeling, however, had no experience or knowledge about the EZRoster product.  Ms. Mahler was the official Subject Matter Expert.  Ms. Blackman never offered Ms. Mahler the option of participating in sales presentations after she returned from maternity leave. Ms. Mahler only heard of the sales presentations because Ms. Breeling asked Ms. Mahler for her assistance to prepare for those presentations and information on the product.

9.     Ms. Mahler asked Ms. Blackman about her decisions regarding EZRoster sales presentations.  Ms. Mahler asked if she could continue to participate in high visibility projects.  Ms. Blackman told Ms. Mahler she did not ask about her willingness to travel because Ms. Mahler was a nursing mother, and Ms. Blackman assumed she was not interested in travelling anymore. Ms. Blackman said Ms. Mahler could continue as part of the PollBook Steering Committee but the previous plan to put Ms. Mahler in charge of that Committee had changed.

10.    On or around February 12, 2015, Ms. Mahler applied for a "Project Release Manager" position for the PollBook Team, which became available after two male employees left

---

[3] EZRoster was the 'oldest' software running on custom-made electronic poll books.

3

ES&S and Ms. Blackman was promoted to a new position, PollBook Director.  During March, 2015 Ms. Mahler interviewed for the position with Ms. Blackman.  Ms. Mahler was fully qualified for the promotion – she has a Master's Degree in Business Administration from University of Nebraska-Lincoln, approximately 10 years of directly applicable work experience, and helped manage the releases and various projects during the prior two and a half years on the PollBook team at ES&S.  Ms. Mahler's annual performance reviews at ES&S were all positive, which resulted in ES&S providing Ms. Mahler with annual raises, including a significant raise in 2014.  Ms. Mahler attended training for and became a Certified Scrum Master in March 2014.  Ms. Mahler was shocked when Ms. Blackman commented that Ms. Mahler did not have enough Project Management experience and was out of touch with the latest EZRoster features because Ms. Mahler had been out of the office too much since her baby was born.  Ms. Blackman also commented that the Project / Release Manager position required more hours in the office than what Ms. Mahler currently was working.  Ms. Blackman informed Ms. Mahler that the final candidate would have to be approved by Ken Carbullido ("Mr. Carbulido"), Ms. Blackman's supervisor.

11.     Several weeks later, Ms. Mahler asked Ms. Blackman about the status of her hiring decision. Ms. Blackman stated that a decision had not been made and again stated Ms. Mahler did not have enough experience for the Project / Release Manager position.  Ms. Mahler said she was going to talk to Mr. Carbullido about the position.  Ms. Blackman said that she did not appreciate Ms. Mahler's attitude and that she needed employees who supported her and her decisions.

12.     Ms. Mahler scheduled an appointment with Mr. Carbullido after her meeting with Ms. Blackman.  During her next one-on-one with Ms. Blackman, which occurred before Ms. Mahler's meeting with Mr. Carbullido, Ms. Blackman told Ms. Mahler a candidate with more experience and who was "better suited" for her plans was chosen for the position.  Ms. Blackman also stated she that was not pleased with Ms. Mahler's job performance.  She asked for a list of

4

the projects on which Ms. Mahler was working. Ms. Mahler emailed her a list of FogBugz[4] tasks, mostly functional specifications, and a few other tasks.

13. After receiving the email, Ms. Blackman informed Ms. Mahler she wanted Ms. Mahler to work on nothing but functional specifications. This was a drastic reduction in the type and quantity of work Ms. Mahler normally performed, which included reviewing implementation of current EZRoster enhancements, bug fixes, reviewing test plans and documentation, and serving as the EZRoster subject matter expert. Ms. Backman did not reassign these tasks, and the team was not informed about the changes in plans so the other team members looked to Ms. Mahler for these responsibilities because these tasks needed to be finish the work planned through June, 2015.

14. Thereafter, Ms. Mahler requested a meeting with Tom Burt, ES&S's Chief Executive Officer, ("CEO"). Ms. Mahler met with him and Vicky Sloan, the ES&S Human Resources Vice President ("VP"), in April, 2015. They discussed employee morale on the team, and Ms. Mahler explained that Ms. Blackman was treating her unfairly, in a discriminatory manner, and asked for their help. They listened and told her that they would talk to Mr. Carbullido and Ms. Blackman.

15. A few days after meeting with CEO and VP, Ms. Mahler met with Ken Carbullido. Ms. Mahler explained to him why she believed she was the best candidate for the Project / Release Manager position, and Ms. Mahler informed him of Ms. Blackman's negative reaction to her application. Ms. Mahler assured Mr. Carbullido she was willing to find a solution to the current issues because she had great respect for Ms. Blackman and did not want a conflict to exist because she enjoyed working at ES&S. Mr. Carbullido said he had full confidence in Ms. Blackman's abilities.

---

[4] FogBugz is the web-based software used to manage the work done by the PollBook Team; it contains a list of tickets, tasks, and the amount of time each would take to close or complete each task.

16. During Ms. Mahler's next one-on-one with Ms. Blackman, she complained that Ms. Mahler was not supporting her in her new role as a PollBook Director (she was promoted in February 2015) and that Ms. Mahler undermined her authority by going to Mr. Carbullido and Mr. Burt. Ms. Blackman repeated that she was not happy with Ms. Mahler's job performance. Ms. Blackman told Ms. Mahler she should be grateful for having a flexible job where Ms. Mahler could take time off work during the day to nurse her baby and go to the doctor as necessary.

17. During April 2014, Ms. Blackman asked on several occasions that Ms. Mahler complete functional specifications in unreasonable amounts of time. Ms. Mahler previously provided estimates for the work to be completed but Ms. Blackman refused to accept them. Ms. Blackman said Ms. Breeling had no problem completing her work but neither Ms. Blackman nor Ms. Breeling knew how long Ms. Breeling needed to write specifications because Ms. Mahler was the only one tracking time.

18. On April 24, 2015 Ms. Mahler requested time off during April 28 and 29, so she could accompany her husband to Chicago. Ms. Blackman denied the request claiming Ms. Mahler needed more time to work on functional specifications. The functional specifications Ms. Mahler was then working on were not for features to be worked on during the ensuing four (4) weeks and most of those were part of the suite of specifications that would be released in January, 2016. Ms. Mahler is the only ES&S employee on the PollBook Team who has ever been denied time off.

19. Ms. Mahler discussed with Ms. Blackman her decision to deny the requested time off. Ms. Mahler explained her belief that there was no valid business reason supporting the decision. She also stated Ms. Blackman was creating a hostile work environment for her based on Ms. Blackman's unreasonable work demands. Ms. Blackman disagreed. She told her that they were all adults and Ms. Mahler should not expect to take time off when there was unfinished work, just like Ms. Mahler should not expect to take time off during the day to nurse her child or

run her errands when ES&S needed her. Ms. Mahler was already working at least 45 hours every week and did not refuse to work overtime when necessary.

20. On April 29, 2014, Ms. Blackman informed Ms. Mahler she had no choice but to put Ms. Mahler on a performance improvement plan ("PIP"). The PIP gave Ms. Blackman 30 days to improve her performance and after 30 days, Ms. Mahler was to make a decision regarding her continued employment at ES&S.

21. Ms. Blackman continued to assign Ms. Mahler work on functional specifications for features that were not part of the PollBook team's current development plan. Ms. Blackman ignored urgent PollBook Team and business needs, and continued to assign Ms. Mahler unrealistic deadlines. Ms. Blackman labeled Ms. Mahler as "insubordinate," claiming Ms. Mahler padded her estimates for completion of the functional specifications and refused to work overtime to meet Ms. Blackman's expectations. Ms. Blackman demanded a review of all Ms. Mahler's specifications. When they reviewed the specifications, Ms. Blackman gave little feedback other than grammatical corrections.

22. Ms. Mahler continuously sought feedback from PollBook team members. During her career at ES&S Ms. Mahler strived to bring value to the workplace and avoided busy work not directly benefiting the team. Ms. Mahler's reputation at ES&S was that she was hard-working, dependable, and reliable.

23. In May, 2015, Heather Bruce (Ms. Bruce") joined the PollBook team as Project / Release Manager. Ms. Heather Bruce was not familiar with the team processes or tools, was not a Certified Scrum Master. Ms. Blackman assigned Ms. Bruce Scum Master responsibilities as soon as she started at ES&S, despite Ms. Mahler's excellent work as Scrum Master for the PollBook team. For several weeks, Ms. Mahler helped Ms. Bruce learn how to use conference room equipment and software and existing policies and procedures

24. Ms. Mahler asked Ms. Blackman about the reasons behind her decision to modify her job responsibilities, specifically the loss of her Scrum Master duties. Ms. Blackman explained

she did not believe that Ms. Mahler could devote the time needed to fulfill her job responsibilities satisfactorily due to her newborn, she needed her to write functional specifications, and she had a bad attitude.

25. While the PIP was in place, Ms. Mahler asked Ms. Blackman for feedback to help improve her performance. Ms. Blackman did not provide any constructive advice or feedback to Ms. Mahler.

26. While on the PIP, Ms. Mahler continued to participate in the enhancements and fixes requested by one of ES&S's oldest and largest customer – the State of Maryland. Ms. Mahler participated in the customer calls with Maryland representatives, prepared work estimates, gathered input from teammates and compiled all hours. Ms. Mahler subsequently reviewed those estimates with the team on May 11, 2015 and then notified Ms. Blackman they were ready. During the PIP, Ms. Mahler also coordinated and organized a knowledge transfer session with Customer Service and Technical Support departments, which took place on Saturday, May 16, 2015.

27. At the end of May, 2015, Ms. Mahler learned about an upcoming Project / Release Manager opening on another team at ES& and planned to apply. Ms. Mahler then asked Ms. Blackman about the status of her PIP, as the 30-day period was almost over and she could not qualify for an internal job while the PIP was in place. Ms. Blackman provided no feedback, stating only that she needed more time to decide.

28. On June 04, 2016, Ms. Blackman escorted Ms. Mahler to a conference room where Vicky Sloan, HR Director was waiting. Ms. Blackman advised Ms. Mahler she decided to fire Ms. Mahler based on performance.

29. ES&S discriminated against Ms. Mahler on the bases of sex and pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as Amended ("Title VII"), and Section 48-1104 of the Nebraska Fair Employment Practices Act, Neb. Rev. Stat. § 48-1101 et seq. ("NFEPA"). ES&S's actions also violated the FMLA.

30. Ms. Mahler filed charges of sex discrimination and pregnancy discrimination against ES&S with the NEOC and the EEOC. *See* NEOC Charge NEB 1-15/16-8-47053-RS; EEOC Charge No. 32E-2015-00748. The NEOC rendered its decision on May 17, 2016. The EEOC issued its Right to Sue letter for Ms. Mahler's charge against ES&S on September 6, 2016. (A true and correct copy of the EEOC letter is attached as Exhibit A and incorporated here as if fully set forth.)

### ES&S DISCRIMINATED AGAINST DORINA MAHLER & RETALIATED AGAINST HER WHEN SHE COMPLAINED

31. ES&S discriminated against Ms. Mahler on the basis of sex and pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as Amended, and Section 48-1104, *et seq.* of the NFEPA.

### Sex & Pregnancy Discrimination in Employment
### 42 U.S.C. § 2000e-2 et seq.
### Neb Rev. Stat. §§ 48-1004 et seq.

32. According to Title VII, it is unlawful for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex, * * * ; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's * * sex * * *.

42 U.S.C. § 2000e-2(a)(1), (2).

33. Title VII also prohibits discrimination specifically because of an employee's pregnancy. The following subsection was added to Title VII in 1978:

(k) The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of p**regnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes,** including receipt of benefits under fringe benefit programs, as other persons not so affected but

9

> similar in their ability or inability to work, and nothing in section 703(h) of this title shall be interpreted to permit otherwise.

42 U.S.C. § 2000e-2(k) (emphasis added).

34. The State of Nebraska followed suit and amended NFEPA to add the following language:

> (2) Women affected by pregnancy, childbirth, or related medical conditions **shall be treated the same for all employment-related purposes,** including receipt of employee benefits, as other persons not so affected but similar in their ability or inability to work, and nothing in this section shall be interpreted to provide otherwise.

Neb. Rev, Stat, 48-1111(2) (emphasis added).

35. ES&S's treatment of Ms. Mahler, as described above in Paragraphs 6 through 28, directly contravened each of the foregoing federal and state statutes. *See, e.g.,* 42 U.S.C. §§ 2000e-2; Neb Rev. Stat. §§48-1104 *et seq.*

## FIRST CLAIM
## <u>SEX DISCRIMINATION BY ES&S</u>
## (42 U.S.C. § 2000e-2; Neb. Rev. Stat. § 48-1101 *et seq.*)

36. Ms. Mahler incorporates by reference paragraphs 1-35, inclusive, as if fully set forth.

37. To state a *prima facie* case of sex discrimination under Title VII, the plaintiff must show: "(1) that [the plaintiff] is within the protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (persons ... of the opposite gender in the Title VII sex discrimination context) were not treated the same." *Breeding v. Arthur J. Gallagher & Co.,* <u>164 F.3d 1151</u>, 1156 (8th Cir. 1999).

31. The purpose of Title VII, as explained in *Keathley v. Ameritech Corp.,* 187 F.3d 915 (8th Cir. 1999), "is to demonstrate that an 'adverse employment action occurred under circumstances which [give] rise to an inference of unlawful discrimination.'" *Keathley,* 187 F.3d at 921 (quoting *Wilson v. International Bus. Machs. Corp.,* 62 F.3d 237, 241 (8th Cir. 1995) (quotation marks omitted). Moreover, "[t]he prima facie case is 'generally sufficient to raise "an

10

inference of discrimination only because the Court presumes an employer's decisions, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* (quoted references omitted). The Eighth Circuit has modified the final element of a *prima facie* case to be that the plaintiff "suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Allen v. Interior Constr. Servs., Ltd.,* 214 F.3d 978, 980 (8th Cir. 2000).

32. Ms. Mahler is in the protected class, as she was pregnant and on leave while employed at ES&S. She was qualified for her positions but suffered an adverse employment action when she was put on a PIP and then terminated after her pregnancy leave.

33. On a regular and ongoing basis, Ms. Blackman changed Ms. Mahler's job ressponsibilities, imposed unrealistic deadlines for her work, and criticized Ms. Mahler's performance. Ms Blackman presumed Ms. Mahler did not want to travel as a result of her pregnancy and child, criticized her for breastfeeding and penalized her for it as well. Ms. Blackman undermined Ms. Mahler's ability to do her job by changing and reducing her job responsibilities but not advising any team members of this change.

35. ES&S provided all its employees with different and better working conditions during their leaves of absence and on their return.

36. There is no legitimate basis justifying ES&S's discriminatory treatment and termination of Ms. Mahler.

WHEREFORE, Ms. Mahler requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1119(4) based on the Defendant's discriminatory terms and conditions of employment.

**SECOND CLAIM**
**PREGNANCY DISCRIMINATION BY ES&S**
**(42 U.S.C. § 2000e-2; Neb. Rev. Stat. § 48-1101 *et seq.*)**

37. Ms. Mahler incorporates by reference paragraphs 1 - 36, inclusive, as if fully set forth.

38. To establish a prima facie case of pregnancy discrimination, Plaintiff must show (1) that she is a member of a group protected by Title VII; (2) that she was qualified for her position with ES&S; (3) that she suffered an adverse employment action; and (4) that she was treated differently than similarly situated non-pregnant employees in the application of work or disciplinary rules.

39. Ms. Mahler is a female, was pregnant, took maternity leave, and had a modified break schedule to allow her to nurse during the work day.  There is a temporal relationship among (a) Ms. Mahler's pregnancy, (b) her application for the Program / Release Manager opening on her team, (b) her complaint of discrimination, (c) her placement on a PIP, (d) her desire to apply for a second Program / Release Manager with a different team, and (e) her June 4, 2015 termination.  ES&S treated Ms. Mahler differently from other employees on medical leave, as described above, during the time she was on pregnancy leave and on her return from pregnancy leave.

WHEREFORE, Ms. Plaintiff requests judgment ordering an award of damages pursuant to 42 U.S.C. § 2000e-2 and Neb. Rev. Stat. § 48-1101 based on the ES&S's discriminatory treatment due to her pregnancy.

### THIRD CLAIM
### ES&S'S TREATMENT OF MS. MAHLER VIOLATED FLMA
### (29 U.S.C. § 2611, et seq.)

40. Ms. Mahler incorporates by reference paragraphs 1-39, inclusive, as if fully set forth.

41. Section 29 U.S.C. § 2615 prohibits discrimination and retaliation with respect to FMLA rights or usage:

> **a) INTERFERENCE WITH RIGHTS**
>
> **(1) EXERCISE OF RIGHTS**
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

    **(2)**    **DISCRIMINATION**
It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

42. After her pregnancy and upon her return to fulltime responsibilities after FMLA leave, ES&S treated Ms. Mahler differently than before. Ms. Blackman changed Ms. Mahler's job responsibilities and took away significant part of her responsibilities, *e.g.*, her role as Scrum Master.

43. In February, when Ms. Mahler applied for a position as Project Release Manager, Ms. Blackman told Ms. Mahler she did not have enough Project Management experience, she was out of touch with current EZRoster features due to her pregnancy leave, and that the Project Release Manager position required more hours than she had recently provided. Ms. Mahler was surprised, based on her education, training, certifications, work experience, and performance.

44. When Ms. Mahler asked Ms. Blackman a few weeks later about the promotion, Ms. Blackman told her a decision not been made and again stated she did not believe Ms. Mahler had enough experience. Ms. Mahler said she would talk to Ken Carbullido about it. Ms. Blackman said she did not appreciate Ms. Mahler's attitude and that the employees needed to support her and her decisions.

45. Before Ms. Mahler could meet with Mr. Carbullido, however, Ms. Blackman advised Ms. Mahler she had already chosen a candidate with more experience and who was "better-suited" for her plans for that position. At the same time, Ms. Blackman told Ms. Mahler she was not pleased with Ms. Mahler's performance and placed Ms. Mahler on a Performance Improvement Plan ("PIP"). ES&S then utilized that discriminatory PIP as the basis for not promoting Ms. Mahler and ultimately terminating her.

46. ES&S treated Ms. Mahler far more harshly than other employees because she became pregnant, took pregnancy leave under the FMLA and when she returned, subjected her to new, different and more harsh employment conditions. Despite her years of dedication, professionalism, and excellent performance, ES&S terminated Ms. Mahler.

13

WHEREFORE, Ms. Mahler requests judgment ordering an award of damages based on ES&S's violations of 29 U.S.C. § 2615.

### REQUEST FOR RELIEF

Ms. Mahler requests judgment in her favor and awarding the following:

1. Damages for Ms. Mahler's lost and future wages;

2. Damages for Ms. Mahler's emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life;

3. Punitive damages for the Defendant's knowing violation of federal discrimination laws and disregard of Ms. Mahler's health and well-being;

4. Costs and attorney fees, as allowed by law, and

5. Other and further relief as the Court deems appropriate.

**PLAINTIFF MAKES DEMAND FOR TRIAL BY JURY.**

        **DORINA MAHLER, PLAINTIFF,**

By: /s/ Terry A. White
Terry A. White #18282
**CARLSON & BURNETT LLP**
17525 Arbor Street
Omaha, NE 68130
Main: (402) 934-5500
Direct: (402) 682-8006
*Attorneys for Plaintiff*
terry@carlsonburnett.com

EEOC Form 161 (11/09)         U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Dorina Mahler
16526 Dorcas St
Omahа, NE 68130


EXHIBIT A

From: St. Louis District Office
1222 Spruce Street
Room 8.100
Saint Louis, MO 63103

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 32E-2015-00748 | Joseph J. Wilson, State & Local Program Manager | (314) 539-7816 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

- NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Joseph J. Wilson*

James R. Neely, Jr.,
Director

September 6, 2016
(Date Mailed)

Enclosures(s)

cc: Vicki Sloan
**Vice President, Human Resources**
**ELECTION SYSTEMS & SOFTWARE, LLC**
11208 John Galt Blvd
Omaha, NE 68137